### AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER J. KEFALAS
### IN SUPPORT OF COMPLAINT

I, Christopher J. Kefalas, Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since 2015. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and the Special Agent Basic Training at the ATF National Academy, both in Glynco, Georgia. I received a master's degree in criminal justice from Northeastern University in 2014 and a bachelor's degree in criminology from Stonehill College in 2012.

2. In my role as an ATF Special Agent, my responsibilities include investigating violations of federal firearms laws, as well as the enforcement of such laws. I am presently assigned to the Bridgewater Field Office, where I am one of a group of Special Agents who work with state and local law enforcement to investigate violations of federal firearms laws in southeastern Massachusetts, including laws related to firearms trafficking, dealing firearms without a license, possession of firearms by prohibited persons, and use of firearms in furtherance of drug trafficking crimes.

3. During my tenure with ATF, I have had training in various aspects of investigations regarding firearms, and have participated in hundreds of such investigations. Among other investigative techniques, I have conducted surveillance, worked with confidential informants, and participated in investigations using court-authorized interception of wire and electronic communications. During my law enforcement career, I have also participated in the preparation and execution of arrest warrants and search warrants.

1

4.	This affidavit is being submitted in support of a complaint charging Joshua Morency ("MORENCY") with violations of 18 U.S.C. § 922(a)(1)(A) (dealing in firearms without a license) and 18 U.S.C. § 922(o) (transfer or possession of a machinegun) (together, the "SUBJECT OFFENSES").

5.	The facts in this affidavit come from my personal knowledge and involvement in the investigation (including my personal observations and review of records); my discussions with fellow agents and officers who assisted in the investigation; and my experience and training as a criminal investigator. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the requested complaint, it does not set forth all of my knowledge about this matter.

## STATEMENT OF PROBABLE CAUSE

6.	In August 2025, the ATF Bridgewater Field Office and Massachusetts State Police ("MSP") began investigating Joshua "Jay" MORENCY, as investigators had become aware that MORENCY was distributing firearms in the Boston, Massachusetts area. MORENCY is not a licensed importer, manufacturer, or dealer under Title 18 of the United States Code.

7.	In the course of the investigation, ATF was able to conduct controlled purchases of firearms from MORENCY, including the purchases discussed further below. While the firearms acquired from MORENCY via these controlled purchases included a commercially manufactured firearm, the majority of the purchased firearms appear to be 3D-printed, privately-made firearms ("PMFs" or "ghost guns"). In addition, ATF purchased from MORENCY a number of machinegun conversion devices (MCDs)[1] that were affixed to 3D printed PMFs.

---

[1] A machine gun conversion device, commonly referred to as a "Glock switch" or

2

8.  Each of the controlled purchases described below was conducted in the same manner, utilizing an ATF confidential informant[2] (hereinafter "CI-1"): prior to any meet, CI-1 communicated with MORENCY by phone, made arrangements with MORENCY to meet at a particular location on a particular date and time to conduct the sale, discussed with MORENCY (typically in coded language) the types/numbers of firearms he was prepared to sell and sometimes the amount of money each firearm would cost, briefed and was briefed by agents, was searched for contraband with negative results, was provided with a designated amount of U.S. currency to pay MORENCY for firearms, was equipped with a recording device, was given access to an ATF undercover vehicle, and was surveilled by law enforcement to and from the designated sale location. Following each controlled purchase, CI-1 provided the firearms

---

"switch," is a firearm as defined in the National Firearms Act (NFA), 26 U.S.C. § 5845(a). A machinegun is defined, in pertinent part, as "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b). An MCD is a part, or combination of parts, designed and intended for use in converting a semiautomatic pistol into a machinegun; therefore, it is a "machinegun." The Gun Control Act, 18 U.S.C. § 922(o), prohibits the transfer or possession of a machinegun manufactured after May 19, 1986. ATF is not aware of any machine gun conversion devices that were developed before May 19, 1986. As such, MCDs are considered post-1986 machineguns. Therefore, they may only be lawfully possessed by properly licensed Federal Firearms licensees who have paid the appropriate Special Occupational Tax required of those manufacturing, importing, or dealing in NFA firearms under the authority of the United States and any department or agency thereof or a State or a department, agency, or political subdivision thereof. U.S.C. § 922(o).

[2] CI-1 has numerous prior arrests, including arrests for Assault & Battery/Disorderly Conduct, Breaking & Entering in the nighttime with intent to commit a felony, and Larceny. All of these charges were dismissed. While working as a documented ATF CI, CI-1 has been arrested in multiple incidents for knowingly receiving stolen property, OUI, Operating Negligently, Assault & Battery, Assault, A&B Dangerous Weapon, Disorderly Conduct, and Disturbing the Peace. All the listed charges have resulted in either not guilty findings or dismissals. CI-1 is cooperating for monetary and immigration benefits. Throughout the course of the investigation, much of the information provided by CI-1 has been independently corroborated. Information provided by CI-1 is believed to be reliable. CI-1 has provided information in the past, conducted controlled purchases on behalf of the government, and previously testified in federal court in a case that resulted in a guilty verdict/conviction.

purchased from MORENCY to law enforcement and any unused government funds were returned to agents.

### August 28, 2025 Controlled Purchase

9. On August 28, 2025, members of the ATF Bridgewater Field Office and the MSP Gang Unit South conducted a controlled purchase of two firearms and ammunition from MORENCY to CI-1 at a Stop & Shop parking lot in Dorchester, Massachusetts (the "PURCHASE LOCATION"). The transaction was audio- and video-recorded.[3]

10. At approximately 10:04 am, law enforcement observed a 2005 black Ford Explorer bearing Massachusetts license plate number 76LF27 (the TARGET VEHICLE) parked at a residence on Lawrence Avenue (TARGET LOCATION 1). At 11:40 am, CI-1 arrived at the PURCHASE LOCATION. CI-1 was operating an ATF undercover (UC) vehicle, which is equipped to record audio and video. At 11:46 am, CI-1 had a phone call with MORENCY, during which MORENCY stated that he needed to get his vehicle. Ten minutes later, CI-1 had another call with MORENCY, during which CI-1 and MORENCY confirmed the purchase of two firearms for $1300.

11. At approximately 12:10 pm, law enforcement observed MORENCY carrying a bag and walking toward TARGET LOCATION 1. MORENCY entered the TARGET VEHICLE parked outside of TARGET LOCATION 1 and departed. MORENCY was then surveilled driving the TARGET VEHICLE directly to the PURCHASE LOCATION.

---

[3] The dates and times reflected in the recordings and associated screenshots are inaccurate; the correct dates are included in this narrative.

12. Upon arriving at the PURCHASE LOCATION, MORENCY was observed carrying a brown paper bag and entering the UC vehicle operated by CI-1 via the front passenger side, as depicted below:



13. MORENCY then handed the bag to CI-1, and CI-1 inspected its contents, which consisted of firearms and ammunition. MORENCY told CI-1 that he has additional customers and that he has another firearm at his residence. MORENCY told CI-1 that he charges one dollar per "head" of "food." Based on my training and experience, I know "food" to be slang for ammunition, and believe MORENCY meant that he charges one dollar per round of ammunition.

14. CI-1 offered to purchase the firearm MORENCY was carrying, which was visible to CI-1. MORENCY brandished the firearm and stated that it is personal and for protection.

15. CI-1 provided MORENCY with the agreed-upon $1,300 in exchange for the purchase. MORENCY counted the cash, as depicted below, and shortly thereafter exited the UC vehicle.

5



16.     Following the transaction, investigators continued surveillance of MORENCY, who was observed driving the TARGET VEHICLE back to TARGET LOCATION 1, parking the vehicle, and later walking to and entering a residence on Creston Street, Boston, Massachusetts (TARGET LOCATION 2), which is located approximately one block away from TARGET LOCATION 1.

17.     While investigators were surveilling MORENCY, CI-1 met with law enforcement, who retrieved the purchased firearms and ammunition from the UC vehicle. The items purchased from MORENCY during the controlled purchase consisted of two PMF 9mm pistols, bearing no serial numbers, and 20 rounds of CCI 9mm ammunition. The purchased firearms were equipped with Taurus and Smith and Wesson slides.

### September 5, 2025 Controlled Purchase

18.     On September 5, 2025, members of the ATF Bridgewater Field Office, MSP Gang Unit South, and the Boston Police Department conducted a controlled purchase of four firearms from MORENCY at the PURCHASE LOCATION. Law enforcement once again used CI-1 to conduct the transaction.

19.     At 11:26 am, CI-1 arrived at the PURCHASE LOCATION. CI-1 was once again operating an ATF UC vehicle, which is equipped to record audio and video. Law enforcement

monitoring the audio heard CI-1 on the phone with MORENCY, telling MORENCY that he was in the same place.

20. At 11:40 am, law enforcement observed MORENCY enter TARGET LOCATION 1 and exit with a box in his hand. MORENCY then entered the TARGET VEHICLE and drove to the PURCHASE LOCATION. Law enforcement then observed MORENCY, who was carrying a cardboard box, enter the UC vehicle driven by CI-1.

21. MORENCY provided CI-1 with a cardboard box containing one PMF .45 caliber, semi-automatic pistol, bearing no serial number and three PMF 9mm, semi-automatic pistols, bearing no serial numbers. CI-1 asked how much for all four firearms, to which MORENCY responded "Three of them is $750 and then the other one is $500." After some negotiation, CI-1 ultimately provided MORENCY $2,760 for the four firearms.

22. MORENCY and CI-1 then had a discussion regarding the pricing of firearms, in response to CI-1's request for a good deal. MORENCY stated, "Bro this is the discount. You know how much I charge, normally?" MORENCY then stated, "$1,000 per." Based upon my training and experience and the context, I believe that MORENCY was referencing other firearms transactions he has conducted with individuals unknown to law enforcement.

23. During their interaction, CI-I asked if MORENCY had "work." MORENCY stated that he does not sell "work" just "the hammers." Based on my training and experience I know "hammers" to be street vernacular for firearms and "work" to be street vernacular for narcotics.

24. At approximately 11:48 am, MORENCY exited the UC vehicle CI-1 was operating. While exiting, MORENCY told CI-1 that he had some more around. CI-1 told MORENCY he liked the green thing MORENCY showed him the other day. MORENCY

confirmed that he still had the green one but did not have it on him during the transaction. MORENCY stated that he has a black and gold one today. Based on my training and experience, I believe that MORENCY was stating that he had a black and gold firearm on his person during the transaction.

25. Following the transaction, investigators continued surveillance of MORENCY, who was observed exiting the PURCHASE LOCATION in the TARGET VEHICLE. MORENCY ultimately returned to TARGET LOCATION 1 before leaving on foot to TARGET LOCATION 2, which he entered.

26. While investigators were surveilling MORENCY, CI-1 met with law enforcement, who observed the firearms purchased during the controlled buy, which consisted of one PMF, .45 caliber semi-automatic pistol with no serial number affixed with a Glock Model 30 .45 caliber slide and one magazine; one PMF, 9 mm semi-automatic pistol with no serial number affixed with a Smith & Wesson, SD9VE 9 mm slide (no serial number) with one magazine; one PMF, 9 mm semi-automatic pistol with no serial number and one magazine; and one PMF, 9 mm semi-automatic pistol with no serial number affixed with a Taurus, PT111 9 mm slide (obliterated serial number) with one magazine.

27. Law enforcement also recovered the cardboard box in which MORENCY delivered the firearms to CI-1.

### September 11, 2025 Controlled Purchase

28. On September 11, 2025, the ATF Bridgewater Field Office, the MSP Gang Unit South, and the Boston Police Department conducted an audio/video recorded controlled purchase from MORENCY at the PURCHASE LOCATION utilizing CI-1.

29. On this date, law enforcement personnel observed MORENCY exit TARGET LOCATION 2 and enter the TARGET VEHICLE. MORENCY was then surveilled to a market,

8

which he entered before eventually proceeding in the TARGET VEHICLE to the corner of Lawrence Avenue and Blue Hill Avenue. MORENCY was observed exiting the TARGET VEHICLE on foot before returning to the vehicle and driving to the PURCHASE LOCATION.

30. During this audio/video recorded controlled purchase from MORENCY, CI-1 provided MORENCY with $2,900 in government funds in exchange for two PMF, .45 caliber, machineguns bearing no serial numbers. These purchased firearms were affixed with Machinegun Conversion Devices (MCDs). CI-1 also purchased a Sig Sauer, Model P320, 9mm, semi-automatic pistol, bearing serial number: 58B143273.

31. During this controlled purchase, MORENCY stated that the two firearms are not "switches" they are conversions and that they are fully auto all the time.[4] MORENCY stated CI-1 "can shoot that clip," which I understood to be referencing the magazine for the provided firearm, and it is automatic. MORENCY also confirmed that the Sig Sauer pistol was semi-automatic.

32. MORENCY told CI-1 that MORENCY has other customers who ship firearms out of the country, including a couple from the Dominican Republic and one from Haiti.

33. Following this controlled purchase, MORENCY was surveilled by law enforcement locally prior to returning to and entering TARGET LOCATION 2.

### September 24, 2025 Controlled Purchase

34. On September 24, 2025, the ATF Bridgewater Field Office conducted an audio/video-controlled purchase of five firearms, including four machineguns affixed with

---

[4] Based on my training and experience, I know that some MCDs contain a feature that allows the firearm user to alternate between semi-automatic and automatic firing positions, typically by manipulating a pin. I understand MORENCY to be indicating that the MCDs installed on these particular firearms do not contain that feature—that is, they would only function as automatic weapons (machineguns).

MCDs, from MORENCY at a Shell gas station parking lot in Dorchester, Massachusetts utilizing CI-1.  Agents were not able to surveil MORENCY in advance of his arrival at the meeting location.  However, law enforcement was able to view footage obtained from cameras installed in the vicinity of TARGET LOCATIONS 1 and 2 that showed at approximately 10:57 am MORENCY leave TARGET LOCATION 1 in the TARGET VEHICLE, drive to TARGET LOCATION 2, enter TARGET LOCATION 2, exit with a box, and get back into the TARGET VEHICLE.  MORENCY arrived at the gas station at shortly thereafter.

35. During this audio/video recorded controlled purchase, CI-1 provided MORENCY a total of $5,600 in government funds for a PMF, 9mm, machinegun, bearing no serial number; two PMF, .40 caliber, machineguns, bearing no serial numbers; one PMF, .45 caliber, machinegun, bearing no serial number; and one PMF, 9mm, semi-automatic pistol, bearing no serial number. The purchased machineguns had MCDs affixed to them.  MORENCY delivered the firearms in a box, as pictured below:





36.     Following the controlled purchase, agents were not able to conduct live surveillance of MORENCY because of traffic conditions and other operational concerns. However, law enforcement was able to observe, via the same cameras referenced above, MORENCY return to TARGET LOCATION 1 and enter TARGET LOCATION 1.

### October 8, 2025 Controlled Purchase

37.     On October 8, 2025, the ATF Bridgewater Field Office and the MSP Gang Unit South conducted an audio/video-controlled purchase of three firearms, including two PMF, 9mm, machineguns bearing no serial numbers and one PMF, AR-Type pistol bearing no serial number from MORENCY at the PURCHASE LOCATION utilizing CI-1. The purchased machineguns had MCDs affixed to them.

38.     In advance of the arranged meeting, law enforcement observed MORENCY outside of TARGET LOCATION 2 and retrieving the TARGET VEHICLE from a roadside parking spot on a neighboring street. MORENCY thereafter returned to TARGET LOCATION 2 in the TARGET VEHICLE and entered the residence with a key. MORENCY left the residence shortly thereafter and was observed driving the TARGET VEHICLE towards the

11

PURCHASE LOCATION. MORENCY met CI-1 at the PURCHASE LOCATION at approximately 12:53 pm.

39. During this audio/video recorded controlled purchase, CI-1 provided MORENCY a total of $4,600 in government funds for the two PMF, 9mm, machineguns bearing no serial numbers and one PMF, .223 caliber, AR-Type pistol bearing no serial number. The purchased machineguns had MCDs affixed and are pictured below:



40. Subsequently, MORENCY was observed driving the TARGET VEHICLE to Lawrence Avenue, briefly parking, and driving to Creston Street. A Massachusetts State Police Trooper, working in an undercover capacity, then observed MORENCY enter TARGET LOCATION 2.

### Further Communications With CI-1

41. MORENCY has been in communication with CI-1 as recently as the week of November 3, 2025. MORENCY informed CI-1 that he had four firearms currently available for sale and may have more available within a week or week and a half.

### CONCLUSION

42. Based on the foregoing, I submit that there is probable cause to believe that:

   a. from at least in or about August 2025 through November 10, 2025, Joshua

MORENCY, not being a licensed importer, manufacturer, or dealer under the provisions of Title 18, United States Code, did willfully engage in the business of dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A); and

    b.    on various dates between August 28, 2025 and October 8, 2025, Joshua MORENCY knowingly possessed and transferred a machinegun, in violation of 18 U.S.C. § 922(o).

*Christopher Kefalas* DK
Christopher J. Kefalas
SPECIAL AGENT, ATF

Sworn to before me by telephone in accordance with Fed. R. Crim. P. 4.1 this 10th day of November, 2025.

HONORABLE DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE